CANNELLA, Judge.
In this community property partition case, defendant, Marilyn A Saacks (Mrs. Saacks), appeals from a judgment classifying assets of the parties. We affirm in part, amend in part and affirm as amended.
*1078 Plaintiff, Antoine M. Saacks, Jr. (Mr. Saacks), filed a petition for divorce on September 8,1993. They were divorced on June 13, 1994. Mr. Saacks subsequently filed a petition for partition of the community property and an accounting. Following that petition, he alleged that a partition was improper since Mrs. Saacks was married prior to her marriage with him and had never been divorced. On January 8, 1996 the trial judge entered a judgment declaring that Mrs. Saacks contracted her marriage with Mr. Saacks in good faith and was entitled to the civil effects of a putative marriage. Mr. Saacks appealed that judgment. The judgment was affirmed by this court in Saacks v. Saacks, 96-736 (La.App.5th Cir. 1/28/97) 688 So.2d 673. Trial proceeded on the partition and | .^accounting. The trial judge granted a judgment of partition on January 26, 1996. On February 6, 1996 both parties filed a partial motion for new trial. On March 28, 1996 the trial judge amended the judgment in part.
On appeal, Mrs. Saacks first argues that the trial judge erred in awarding her only 25% of the United Gaming, Inc. settlement funds, rather than 50% due her under the community. Second, she argues that the trial judge erred in refusing to declare two pieces of property to be community property. The properties are located in New Orleans, Louisiana on West Robert E. Lee Boulevard and at 800-808 Baronne Street and 834-36 Julia Street. Third, Mrs. Saacks asserts that the trial judge erred in requiring her to account for all of the community assets in her possession, while not requiring Mr. Saaeks to do so. Fourth, she contends that the trial judge erred in declaring Mr. Saacks’ gun collection to be his separate property.
We note at the outset that Mr. Saaeks has neither answered the appeal nor filed a cross appeal. Nevertheless, Mr. Saacks raises specifications of error in his brief and requests this court to consider these pursuant to La. C.C.P. art. 2133(B)[1] and Barr v. Smith, 598 So.2d 438, 443 n. 2 (La.App. 2nd Cir.1992) on the basis that no modification of the judgment would result. He argues that if this court finds reversible error, as asserted by Mrs. Saacks, it should offset that error with those errors alleged by him. The errors alleged by Mr. Saacks, should |4these have merit, would result in a modification of the judgment before us, the effect of which would be a different distribution of the property than that which is contained in the judgment. However, he argues that this court should take notice that the parties have now liquidated these assets and, as such the liquidation has resulted in a “balance sheet.” Thus, he asserts that the judgment before this court should be affirmed by allowing the alleged errors raised by him to offset any alleged errors raised by Mrs. Saacks. We disagree with such an analysis and find Matthews v. Consolidated Companies, Inc., 95-1925 (La.12/8/95) 664 So.2d 1191, 1192, rehearing denied, 95-1925 (La.1/26/96) 666 So.2d 662 dispositive. The Matthews court explained:
While a defendant who has not appealed or answered the appeal and who did not seek modification, revision or reversal of that judgment may assert in support of that judgment any argument supported by the record under La. C.C.P. art. 2133, he may not obtain a modification of the judgment *1079 without appealing or answering the appeal [emphasis added.]
In the instant ease, Mr. Saaeks does not merely raise an “argument” supported by the record, but instead argues for a different apportionment of the'assets. La. C.C.P. art. 2133; Matthews v. Consolidated Companies, Inc., 664 So.2d at 1192. Should this court find merit in the alleged errors raised by him, the effect would be a modification of the partition judgment. This court has no jurisdiction to receive new evidence in the form of the alleged liquidation of the assets and “balance sheet.” Phillips v. Space Master Intern., Inc., 96-877 (La.App. 5th Cir. 5/14/97) 696 So.2d 64, 68. Furthermore, whether the property has been liquidated is a fact that is not in the record. We cannot consider matters not in the record before us.
SETTLEMENT PROCEEDS
Mrs. Saaeks contends that the trial judge erred by awarding her 25% of settlement funds "which Mr. Saaeks received from United Gaming, Inc., instead of the 50% share to which she is entitled. She argues that the settlement was to |5compensate Mr. Saaeks for work which he did preparing the way for United Gaming, Inc. to enter the gaming market in Louisiana and to assist in the legislative passage of gaming laws in Louisiana. The settlement amount was for $325,000.
In making his determination, the trial judge stated:
IT IS ORDERED, ADJUDGED AND DECREED that fifty (50%) per cent of the proceeds from the United Gaming, Inc. settlement signed on August 20, 1993 is a community asset. This ruling is based on testimony and evidence indicating that Antoine Saaeks first began a relationship with United Gaming, Inc. in the 1990’s, a relationship in which Marilyn Saaeks participated. It was also determined that a portion of the settlement included consideration for introduction and contacts provided by Antoine Saaeks during the existence of the community.
Defendant argues that the entire settlement is community property which should have been partitioned equally. She testified that the $325,000 was a settlement resulting from Mr. Saack’s lobbying efforts during the existence of the community. She testified that Mr. Saaeks admitted in a press release to having worked “thousands of hours for United Gaming” for three years during the marriage.
Mr. Saaeks testified that he received $325,-000 from United Gaming, Inc., but denied that the settlement included past wages. He contends that the settlement was for a breach of a contract for security services, which were to be provided by him to United Gaming, Inc. over a 15 year period. He was unable to produce a copy of this agreement, which he claimed he did not sign when it was reduced to writing, because United Gaming, Inc. changed the terms.
The transcript of the Civil Service Commission proceeding involving Mr. Saaeks’ efforts to be reinstated as a police officer,[2] dated February 10,1995, was introduced into evidence. Carol Carter (Carter) testified via telephone from RLas Vegas, Nevada. She was a consultant for United Gaming, Inc. from 1989 to 1991. In 1991 she became the vice-president of administration for the company. In August or September of 1991, she became the President and Chief Operating Officer of United Gaming, Inc. In July of 1993, she left the company as President but continued doing consulting work for them. Mr.-Saaeks was introduced to the company when she was vice-president and was present at meetings concerning the potential gaming opportunities in Louisiana. When she was president, Carter met with Mr. Saaeks to discuss gaming opportunities in Louisiana.
In the early part of 1992, an application for licensing was filed with the Louisiana State Police indicating the partners in the Louisiana gaming venture. The papers were filed by Louisiana Ventures, Inc., a subsidiary of United Gaming, Inc. Carter testified that Mr. Saaeks’ name was never transmitted to the Las Vegas gaming officials or the Louisiana Gaming officials as a part owner or shareholder in the gaming ventures.
*1080 At first, Carter claimed that the company did not intend to grant Mr. Saaeks an ownership interest in the company. However, when referred to an earlier deposition to refresh her recollection, she admitted that Mr. Saaeks was to receive a percentage of the company for the services which he performed, without putting up any substantial sums of money. However, his membership was “objected to” and, instead, the company and Mr. Saaeks considered a security consulting agreement. This possibility was also rejected because the Nevada Gaming Control Board responded negatively to this arrangement, as well. Carter stated that Mr. Saaeks performed the following services which would have entitled him to an interest in the company: (1) he introduced the company to someone who then introduced them to the fairgrounds, and (2) he offered to introduce them to bar owners in the area around Bourbon Street.
Robert A. Woodson (Woodson) also testified in the New Orleans civil |7,service hearing. At the time, he was Vice-President of Regulatory Compliance for Alliance Gaming Corporation, formerly United Gaming, Inc. Woodson was employed by the company since 1988. In 1990, he became Director of Gaming (regulatory) Compliance in Nevada. In July of 1990 he was introduced to Mr. Saaeks, who was interested in the video poker industry. They discussed the possibility of gaming legislation being passed in Louisiana. However, when the company began considering a security contract with Mr. Saaeks, the Nevada Gaming Control Board raised questions which indicated to him that the board had serious concerns about his involvement. Woodson stated that by December of 1992 the only possible relationship with the company could foresee with Mr. Saaeks was a security consulting service and not a partnership interest. However, this relationship was rejected because of the negative reaction that he received from the Nevada Gaming Control Board when it was discussed at a meeting with the Board.
Woodson testified that he was aware that Mr. Saaeks anticipated having an interest as a result of his work. However, he said that this did not mean that United Gaming, Inc. anticipated Mr. Saaeks having an ownership interest. He thought that the settlement was paid to Mr. Saaeks because of his threatening to file a lawsuit, but he was not involved in the settlement, nor the negotiations leading up to the settlement.
Woodson stated that, to his knowledge Mr. Saaeks never worked for United Gaming, Inc. nor did he directly perform any services for United Gaming, Inc. He believed that Mr. Saaeks did some lobbying with the legislature to have gambling legalized, but he thought he did this on behalf of a Chief of Police Association. He did not know whether Mr. Saaeks facilitated introductions with fairgrounds officials.
' A letter from Mr. Saaeks to Fred Welms of United Gaming, Inc. dated July 14, 1993, was introduced into evidence. In that letter, he expresses his | «dissatisfaction with the progress of his contractual relationship with United Gaming, Inc. He notes that they had numerous meetings to resolve the matter, that he “carried out” his “part of the bargain,” and that Fred Welms and the others he dealt with “agreed to that.” He continues by saying “Since that is so, I am entitled to one sixth (l/6th) ownership of Video Services, Inc. You have acknowledged that, ...” Mr. Saaeks states that because they perceived his stock ownership in the company as creating a problem because of his position with the police department, “I was agreeable to your suggestion that I accept alternate payment in an amount equal to the worth of what my ownership would have been ... As you know, I even agreed to serve as a security consultant for the company over a fifteen (15) year period for remuneration that would, he equivalent to what the stock was worth.” Mr. Saaeks ends the letter by asserting that “Unless the stock ownership is promised to me, or satisfactory alternative payment is delivered ...” he would retain counsel and file suit.
The August 20,1993 settlement agreement was introduced into evidence. It recites that two equal installments of $162,500 were to be paid on August 23, 1993 and January 7, 1994 in full settlement for “all claims for compensation and/or damages which may have been earned or suffered by [Antoine] SAACKS, as *1081 outlined in Antoine Saaeks letter of July 14, 1993 to Fred Welms ..., and any other claims ... which may have arisen out of any lobbying efforts, efforts in obtaining clientele or potential contracts for UNITED GAMING ...” The settlement agreement further releases the company and its employees, etc. from all past, present and future claims for losses, damages, causes of action etc., for past, present and future damages or loss of contractual rights, property rights etc. which may have been sustained or incurred or might in the future.be sustained in any way arising out the relationship.
The terms of the settlement include, compensation for lobbying efforts which were made during the existence of the community. The trial judge ^correctly determined that the settlement included “consideration for introduction and contacts provided by Antoine Saaeks during the existence of the community.” However, the letter referred to in the settlement indicates that the security services were to be in lieu of stock ownership, as remuneration for the loss of the ownership interest, which in turn, was based on his activities on the company’s behalf. The settlement, therefore, compromised the claim for money owed to Mr. Saaeks for the activities which he undertook during the existence of the community, therefore, it is community property.
Mr. Saaeks argues that the settlement is separate property pursuant to La. C.C. art. 2344. We find that article inapplicable as, by its clear wording, it applies to settlements for personal injuries. This is a matter of breach of contract, not a personal injury. See: Roge v. Roge, 604 So.2d 721, 723 (La.App. 2 Cir.1992).
Consequently, we amend the judgment to reclassify the settlement money as community property, and award Mrs. Saaeks 50% of the $325,000 which Mr. Saaeks received in the settlement of his claims with United Gaming, Inc.
REAL PROPERTY
Mrs. - Saaeks argues that the trial judge erred in refusing to declare as community the property on West Robert E. Lee Boulevard, Baronne Street and Julia Street. She argues that the trial judge erred in refusing to admit the deposition of Jay Saaeks, Mr. Saaeks brother, to impeach Mr. Saack’s credibility on this issue. Mrs. Saaeks alternatively argues that the values for these properties should be attributed to the community.
The trial judge found that these properties were neither community property nor Mr. Saaeks separate property, apparently concluding that the properties were owned by other parties.
Jay Saaeks is listed as the owner of the West Robert E. Lee Boulevard |10property on the act'of sale dated September 15, 1992. The property was purchased as a lot and a double was later built on the lot. A purchase agreement signed by Mr. Saaeks for the West Robert E. Lee Boulevard property dated August 28, 1992 was also introduced into evidence.
Mr. Saaeks testified that he never owned an interest in the West Robert E. Lee Boulevard property. He stated that the owner was Jay Saaeks and there is no counter letter showing that is the owner. He admitted that he signed a purchase agreement for the property. He explained that he discussed the purchase with his wife because he needed to move to New Orleans due to new police residency requirements, but that she refused to leave their Metairie family home. Although he had placed a $1,000 deposit on the lot, Mrs. Saaeks refused to go along. Mr. Saaeks claimed that he told his brother that this was a good business opportunity and that his brother took advantage of it. He said that he assisted his brother in the construction of the double, but did not get paid.
Mr. Saaeks testified that he dealt with Campbell Cabinets for years prior to the construction at West Robert E. Lee Boulevard. Thus, various invoices for the West Robert E. Lee Boulevard construction were sent to him since Jay Saaeks did not have a relationship with that company. In addition, Mr. Saaeks signed the building permit for the West Robert E. Lee Boulevard property, because he knew the head of the inspection department and in order to cut through the red tape. He also signed some checks for construction costs. He also testified that Jay *1082 Saacks had a cheeking account for the payment of contractors that Mr. Saacks was a signatory on. However, Mr. Saacks contended that the money in the account belonged to Jay Saacks. Mr. Saacks stated that he lives in one-half of the West Robert E. Lee Boulevard double. He does not have a lease with his brother, nor does he pay him rent.
Mrs. Saacks denied that Mr. Saacks ever showed her the agreement to purchase or explained to her that he needed to move to New Orleans in order to Inkeep his job. However, she stated that she had no documentary evidence that Jay Saacks was not the owner of the West Robert E. Lee Boulevard property. She also had no evidence that Mr. Saacks paid for the purchase of this property. The only evidence she had was that “Antoine had a lot of cash and he gave it to his brother to buy the house for him.” She admitted she did not know this for a fact and that it was a belief on her part.
She was referred to her deposition of September 9, 1994 in which she answered that she had no idea what money was used to purchase the West Robert E. Lee Boulevard lot. At that time, she testified that she “assumed” it was his money from the sale of his car. At trial, however, she stated that she later learned that he probably had $300,-000 to $400,000 hidden somewhere, which he has distributed to his father and brother. She stated that if his mother were alive, he probably would be giving it to her as well. Mrs. Saacks said that her evidence of this was Jay Saacks’ statement in his deposition that Mr. Saacks gave him the money to purchase the West Robert E. Lee Boulevard property. Mrs. Saacks also stated that the seller informed her that Mr. Saacks gave her a $1,000 cashier’s check to hold the property. Mrs. Saacks believed that he probably sold his Mercedes for these funds. She had no evidence regarding whether the $1,000 deposit was returned to Mr. Saacks.
Mrs. Saacks testified that she believed that some of the money for the construction of the double on West Robert E. Lee Boulevard came from the bank account in the names of Jay Saacks and Mr. Saacks. She did not know how the money got into that account. She stated that she only knew the origin of the $400. Mrs. Saacks stated that she did not know the cost of construction, but believed that much of the work was from co-employees who were not paid.
Mrs. Saacks testified that Mr. Saacks told her he purchased the properties in Jay Saacks’ name. She was unaware of whether the West Robert E. Lee Boulevard property had a mortgage. Mrs. Saacks stated that Mr. Saacks toldj^her that Mark Herman was a tenant at the West Robert E. Lee Boulevard property when she visited Mr. Saacks at his residence, the other side of the double in April of 1994. She had no evidence to contradict any testimony that Mark Herman’s lease was with Jay Saacks.
Mrs. Saacks was shown invoices from Campbell Cabinets, Inc., which she stated were mailed to the parties’ family home. The invoices were introduced into evidence. They indicate that items were sold to Mr. Saacks and shipped to him at West Robert E. Lee Boulevard in December of 1993 and January of 1994. Mrs. Saacks stated that she had purchased cabinets from this company many times for the family home. She also testified she did not pay these 1993-94 invoices.
Mrs. Saacks testified that she thought Mr. Saacks and Jay Saacks had another account at Jefferson Guaranty Bank with $157,477.68. She was shown checks drawn from that account and admitted that Mr.. Saack’s name was not on the account.
Sandra Saacks, Jay Saacks’ former wife, testified that she claims ownership of the West Robert E. Lee Boulevard property in her community partition proceedings.
Mr. Saacks also testified that he never owned an interest in the properties located on Baronne Street and Julia Street. He claimed that he never told Mrs. Saacks that he owned these properties. Mr. Saacks said that he never received any rental income from the Julia Street property and when his brother, the owner, sold the property, he, did not receive any proceeds from the sale.
Mr. Saacks testified that he neither loaned his brother, Jay Saacks, $110,000 to purchase the Baronne Street and Julia Street properties nor did he loan Ms brother $38,500 for *1083 the purchase of the West Robert E. Lee Boulevard property. He said that if his brother testified he did so, then his brother was mistaken. He admitted, however, that, he loaned his brother approximately | i3$160,000 to construct the double on the West Robert E. Lee Boulevard property. He asserted that the money came from the United Gaming, Inc. settlement proceeds.
Mrs. Saacks raises- as an error the trial judge’s failure to admit the deposition of Jay Saacks. That deposition was taken in an unrelated matter. The transcript shows that the deposition was offered by way of proffer should Jay Saacks not be subpoenaed for trial.[3] The trial judge allowed the trial to remain open in order to allow Mrs. Saacks additional time within which to depose Jay Saacks.[4]
The proffer states that Jay Saacks would testify that Mr. Saacks loaned him the money to purchase the properties at West Robert E. Lee Boulevard and Baronne Street, and Julia Street. Thus, Mrs. Saacks argues that the introduction of this testimony would have shown contradictions between the testimony of Jay Saacks’ and Mr. Saacks’, thus destroying Mr. Saacks credibility as a witness. Mrs. Saacks further argues that the property should be considered community property since it was purchased with loans from Mr. Saacks to Jay Saacks, using funds which were community property.
We find no abuse of the trial judge’s discretion in sustaining the objection to Jay Saacks’ proffered testimony. First, Mrs. Saacks was given the opportunity to obtain a deposition following the trial, which she failed to do. Second, the statements sought to be introduced by Mrs. Saacks were in evidence through the testimony of Jay Saacks’ former wife. .Sandra Saacks testified that she was a witness to Jay Saacks’ deposition taken on December 6, 1994. She was | masked by Mr?. Saack’s counsel whether Jay Saacks testified as to the source of his funds for the purchase of the West Robert E. Lee Boulevard, Julia Street, and Baronne Street properties. Sandra Saacks asserted that Jay Saacks testified that he had borrowed these funds from Mr. Saacks. The trial judge allowed this questioning of Sandra Saacks over the objection of Mr. Saacks. Thus, the content of the proffered deposition was merely cumulative evidence since the evidence was admitted through her testimony. Therefore, we find that the trial judge did not abuse his discretion in sustaining an objection to the admissibility of the deposition.
After our review of the testimony and evidence relative to the real property, we find that there is no evidence that the properties were either community or separate assets of Mr. Saacks or Mrs. Saacks. Thus, we find that the trial judge did not err in refusing to classify the properties as community.
Mrs. Saacks alternatively argues that community funds were fraudulently used for the purchases and the funds should be fictitiously returned to the community. Additionally, she argues bad faith on the part of Mr. Saacks and she seeks reimbursement to the community. However, no petition for mismanagement; bad faith, fraud or reimbursement has been filed in this record. Thus, these issues were not addressed by the trial judge. This court will not consider an argument raised for the first time on appeal. Handy v. Cheatum, 410 So.2d 322, 323 (La.App. 4th Cir.1982); Lutz v. Jefferson Parish School Bd., 503 So.2d 106, 110 (La.App. 5th Cir.1987). As noted in Monje v. Monje, 94-622 (La.App. 5th Cir. 12/28/94), 648 So.2d 1086, 1090, “we, as did the trial judge, only consider the partition of the community property.”
In her third specification of error, Mrs. Saacks argues that the trial judge erred in *1084 not requiring an accounting from Mr. Saacks, while requiring an accounting from her. Again, we have examined the record and find no petition filed on behalf of Mrs. Saacks seeking an accounting. The only petition seeking |15an accounting was filed by Mr. Saacks. The judgment further reveals that these issues were never addressed by the trial judge. Like her claims of fraud, etc. this court will not consider an argument raised for the first time on appeal. Handy v. Cheatum, 410 So.2d at 323; Lutz v. Jefferson Parish School Bd., 503 So.2d at 110.
GUNS
Appellant argues the trial judge erred in failing to award her 50% of the gun collection which was appraised at $13,284.50 in 1979. The trial judge concluded that the guns were separate property since the testimony indicated these were given to Mr. Saacks as gifts from criminal court judges. Ernest Demma, a New Orleans police captain, testified that judges donate sometimes formerly used weapons from criminal proceedings to policemen. They do this through a court order. The intent and purpose of the donation is to allow law enforcement officers to use these confiscated weapons in the performance of their duty. Officer Demma identified nine donations made to Mr. Saacks in 1990 and 1991.
Mr. Saacks testified that he had “two or three more” guns in his possession which were not given to him by the judges. He said that some of his guns were taken back by the police department. Although Mrs. Saacks claimed that he had $20,000 worth of guns in his possession, Mr. Saacks denied this. He stated that since the separation he has never had $20,000 worth of guns in his possession.
Mr. Saacks testified that he had accumulated a large collection of guns over the years. He had purchased some guns from a company in New Orleans. A document showing an appraisal, identifying 43 weapons, performed on December 20, 1979 was introduced into evidence. However, Mr. Saacks testified that, over the years, some of these guns were traded, sold, or stolen prior to the termination of the community. He testified that he no longer had an |i6extensive collection of guns.
Mr. Saacks also testified that, in May of 1994, he heard a rumor that his estranged wife was trying to sell his gun collection. When she was out of town, he went to the family home and looked into the window. He noticed that approximately 80% of his gun collection was gone. Mr. Saacks stated that he then entered the house and found that most of his guns were missing.
Mrs. Saacks testified that when she returned from her trip in 1994, some of the guns were missing. She attributed their loss to Mr. Saacks entering the home and removing them. Mrs. Saacks recognized Mr. Saacks’ entitlement to the guns received as gifts from the judges.
Sandra Saacks testified that in 1985 or 1986 the parties herein had separated. At that time Mr. Saacks brought guns to the home which she shared with Jay Saacks. The guns remained in her house for four to five months, at which time the parties herein reconciled. She did not know what became of the guns after Mr. Saacks collected them.
After reviewing the record, we find no manifest error in the trial judge’s factual finding that the extensive gun collection was no longer in Mr. Saack’s possession due to trading, sale, and theft.
Accordingly, the judgment of the trial court is hereby amended to declare the settlement received by Mr. Saacks from United Gaming, Inc., in the amount of $325,000 to be a community asset, to be divided equally between the parties. The judgment is affirmed in all other respects.
Costs of this appeal are to be paid by Mr. Saacks.
AFFIRMED IN PART AND AMENDED IN PART AND AFFIRMED AS AMENDED.

. La. C.C. P. art. 2133 provides:
A. An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer. Additionally, howev-er, an appellee may by answer to the appeal, demand modification, revision, or reversal of the judgment insofar as it did not allow or consider relief prayed for by an incidental action filed in the trial court. If an appellee files such an answer, all other parties to the incidental demand may file similar answers within fifteen days of the appellee's action.
B. A party who does not seek modification, revision, or reversal of a judgment in an appellate court, including the supreme court, may assert, in support of the judgment, any argument supported by the record, although he has not appealed, answered the appeal, or applied for supervisory writs.

. Antoine Saacks v. Department of Police, No. 4890

. La. C.C.P. art. 1636(A) provides:
A. When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or -permit the party to make a statement setting forth the nature of the evidence, [emphasis added.]

. There is neither a deposition nor a proffered deposition in the designated record of this case, nor is one listed by the clerk of court in the exhibit index. It is clear, however, that Mrs. Saacks did preserve her objection to the trial judge’s sustaining an objection as to the admissibility of the deposition and her counsel stated for the record the content of the proffered testimony.