735 So.2d 116 (1999)
PELTS & SKINS EXPORT, LTD.
v.
STATE of Louisiana, Through the DEPARTMENT OF WILDLIFE AND FISHERIES.
No. 97 CA 2300.
Court of Appeal of Louisiana, First Circuit.
April 1, 1999.
Opinion Denying Rehearing June 15, 1999.
*120 William E. Brown, Jacques F. Bezou, Covington, LA, Scott D. Wilson, Baton Rouge, LA, for plaintiff/appellee, Pelts & Skins Exports, Ltd.
T. Jay Seale, III, Mark E. Seamster, Hammond, LA, T. Michael Landrum, Baton Rouge, LA, for defendant/appellant, State of Louisiana through the Department of Wildlife & Fisheries.
BEFORE: LeBLANC, FOGG and PARRO, JJ.
LeBLANC, J.
This appeal is from a trial court judgment in favor of plaintiff, Pelts and Skins Export, Ltd. (Pelts), and against defendant, the State of Louisiana, through the Department of Wildlife and Fisheries (DWF).

FACTS AND PROCEDURAL HISTORY
The alligator industry, operating for many years early in the 1900s, was revived in Louisiana in 1972 with the approval of a program for harvesting wild alligators. Zachary Casey and others organized Pelts as a dealer in alligator skins in 1986, purchasing wild skins from alligator hunters for export. Pelts grew, and from 1988 until 1990 the number of skins, gross sales and percent of market share by Pelts increased. During the 1988 tag year, which ran from September 1988 through September 1989, Pelts exported 13,441 skins and held a market share of 26.88%. By tag year 1990, Pelts exported 51,000 skins and held a market share of 46.96%.
During the late 1980s, many saw the future of the industry as promising and began alligator farming operations to provide a year-round source of alligator skins. The number of licensed farming operations in Louisiana grew from 47 in 1988 to 134 in 1991. To provide a supply of farm skins to Pelts, Plaquemines Alligator Farm (PAF) was established. Amy Holding Company owned both Pelts and PAF, and Casey was president of both. PAF sold farm skins to Pelts, which exported both farm and wild skins to several foreign importers for manufacture into luxury items such as handbags, belts, boots and watchbands.
In Louisiana, the alligator industry is regulated by the state. DWF's Fur and Refuge Division has the primary responsibility for administration of the alligator industry. DWF's Enforcement Division has the primary responsibility for enforcement of the state and federal regulations controlling the industry. These regulations include Rules by the Fur and Refuge Division for the taking and tagging of wild skins, including the manner of skinning and method of attachment of official tags. Every wild skin which has been taken by a hunter is required to have attached an official tag, inserted in the last six inches of the tail. In addition, each yearly season specialized skinning instructions, valid only during that particular hunting season, are issued.
Agents from the Enforcement Division conducted inspections in the fall of 1991 to insure compliance with the 1991 skinning and tagging regulations. Pelts' warehouse *121 was inspected on September 24, 1991. As a result, 378 skins were seized for tagging and skinning violations and 10 citations were issued against Pelts and Minos Scarabin, Pelts' warehouse manager. Criminal charges were referred to the U.S. Attorney and a federal grand jury subsequently indicted Pelts and Scarabin, but these charges were later dismissed.
Immediately following the September 24, 1991 inspection and seizures, Pelts asserted confusion concerning the skinning and tagging regulations and sought and received a preliminary injunction against DWF, enjoining DWF from conducting further raids. PAF sought protection from creditors by declaring bankruptcy in December 1991 and Pelts declared bankruptcy in January 1992.[1] In addition, Pelts sued DWF alleging damage to Pelts as a result of the inspection and seizure. Although individual DWF agents were originally named as defendants by Pelts and numerous causes of action were alleged, a joint stipulation was entered into wherein DWF stipulated to liability.[2] In return, Pelts dismissed the DWF agents and compromised many of the claims against DWF. The issue of damages was tried and judgment was rendered in favor of Pelts and against DWF. The trial court, in written reasons, found the inspection and seizure by DWF caused damages to Pelts. Judgment was rendered, awarding Pelts $4,607,693.[3] These damages were designated in an attachment to the judgment as follows:

 $3,961,416 Lost Profits
 74,627 378 Lost Skins
 21,986 105 Deteriorated Skins
 58,585 Criminal Defense Costs
 383,079 Reorganization Expenses
 108,000 Civil Legal Costs
____________
 $4,607,693 TOTAL DAMAGES

DWF now appeals. DWF's assignments of error encompass two major areas: evidentiary matters and damage issues.

I.
DWF argues error in certain of the trial court's evidentiary rulings.

A. WAYNE SAGRERA
DWF assigns as error the failure of the trial court to accept Wayne Sagrera as an expert and certain trial court rulings during Sagrera's testimony. Louisiana Code of Evidence article 702 provides a witness may be qualified as an expert by knowledge, skill, experience, training, or education to assist the trier of fact to understand the evidence or to determine a fact in issue. An expert may testify in the form of an opinion. La.C.E. art. 702. To determine whether a witness is an expert, the court is guided by two primary concerns: whether the witness plans to testify to actual technical knowledge and whether such knowledge will assist the trier of fact in understanding. Southern Message Service, Inc. v. Commercial Union Ins. Co., 26,311, p. 5 (La.App. 2 Cir. 12/7/94); 647 So.2d 398, 402, writ denied, 95-0059 (La.3/10/95); 650 So.2d 1180. Experience alone may be sufficient to qualify a person as an expert. Hebert v. Broussard, 450 *122 So.2d 1038, 1040 (La.App. 1 Cir.1984). Bias does not preclude a witness from being qualified as an expert. State v. Lewis, 95-0209, p. 6 (La.App. 4 Cir. 4/13/95); 654 So.2d 761, 765. In addition, that a witness is a party or an employee of a party does not preclude his qualification as an expert because the potential bias of the witness may be explored on cross-examination. O'Brien v. Remington Arms Company, Inc., 601 So.2d 330, 336 (La.App. 2 Cir.), writ denied, 604 So.2d 1003 (1992). The decision as to whether a person is qualified as an expert is within the discretion of the trial judge. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545, p. 12 (La.App. 1 Cir. 3/11/94); 634 So.2d 466, 477, writ denied, 94-0906 (La.6/17/94); 638 So.2d 1094. The appellate court, absent a clear abuse of the trial judge's discretion, will not disturb this determination. Maxwell v. State, Through Department of Transportation & Development, 391 So.2d 1230, 1233 (La.App. 1 Cir.), writ denied, 394 So.2d 281 (1980).
Sagrera began buying and selling alligators at 13 years of age and has been involved in the alligator industry his entire adult life, engaged in both farming and exporting activities. DWF offered Sagrera as an expert in the field of farming and selling Louisiana alligators. Pelts objected and the trial court sustained Pelts' objection. The trial court refused to qualify Sagrera as an expert, reasoning, "I have trouble with this man.... He's acknowledged that he's a direct competitor of [Pelts]. I think that taints his ability to be an objective, independent, impartial expert." The trial court admitted Sagrera as a fact witness only.
We find the failure of the trial court to admit Sagrera as an expert in the alligator industry was an abuse of discretion. The alligator industry is both a relatively small and very specialized business activity. Individuals involved are virtually all competitors of one another, whether they engage in hunting, farming, or exporting activities. Sagrera's competitive business interests do not automatically disqualify him because of bias, just as a business associate would not automatically be considered free from bias. Sagrera's potential bias could have been explored on cross-examination. The circumstances of Sagrera's competitive position affected only the weight and not the admissibility of his testimony. See State Through Department of Transportation and Development v. Wahlder, 94-761, p. 7 (La.App. 3 Cir. 12/7/94); 647 So.2d 481, 486. Although the ruling by the trial court in failing to qualify Sagrera as an expert in the alligator industry was error, if the error did not have a prejudicial effect on the case, the trial court's findings are not interdicted. See Picon v. Ferrara, 483 So.2d 915, 918 (La.1986); Rivere v. Union Pacific Railroad Company, 93-1132, p. 4 (La.App. 1 Cir. 10/7/94); 647 So.2d 1140, 1144, writ denied, 95-0292 (La.3/24/95); 651 So.2d 295.
In the proffer of Sagrera's expert opinion testimony, he testified concerning the procedure he would follow when he questioned whether a skin was in compliance with the skinning regulations. He also stated it would be unusual for an exporter to accept a large number of questionable skins from one hunter, considering the possible loss from confiscation. Sagrera testified that no major buyers or tanners told him the inspection and seizure had any effect on the price of skins or the reputation of the Louisiana alligator industry. Sagrera testified to statements made to him by Patrice Mathieu, a buyer, which contradicted testimony offered by Mathieu and Casey. Sagrera also testified concerning statements by Ted Joanen, plaintiffs expert, concerning Joanen's opinion of Casey. Lastly, Sagrera stated it was his opinion the inspection and seizure at Pelts did not have an effect on the alligator market.
We do not find the exclusion of the opinion testimony by Sagrera prejudicial. His opinion testimony did not contribute credibility to DWF's defense that it did not *123 cause Pelts' damages, but simply addressed issues concerning the alligator industry at large and the credibility of Casey and Mathieu, witnesses which the trial court had the opportunity to evaluate. Finding the error of excluding Sagrera's opinion testimony harmless, we will apply the clearly wrong-manifest error standard of Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993), to our review of the trial court's finding of causation included in our discussion on damages. Hebert v. Southwest Louisiana Electrical Membership Corp., 95-405, p. 10 (La.App. 3 Cir. 12/27/95); 667 So.2d 1148, 1156, writs denied sub nom., McSpadden v. Southwest Louisiana Electrical Membership Corp., 96-0277, 96-0798 (La.5/17/96); 673 So.2d 607, 608.

B. HEARSAY
DWF also challenges specific rulings by the trial court excluding testimony from Sagrera and Chris Plott with respect to what other persons may or may not have said concerning the effect of the inspection and seizure. Both were asked whether anyone had ever stated to them that the 1991 inspection and seizure at Pelts' warehouse had an effect on the alligator industry. DWF asserts questions regarding whether a witness knew if others ever made certain statements were not hearsay. A witness is generally competent to testify that a statement was made to him, so long as no attempt is made to vouch for the credibility of its contents. State v. Lapworth, 517 So.2d 485, 487 (La. App. 1 Cir.1987). It follows that a witness may also testify that a statement was not made to him. As these rulings were in error, we must determine if they interdicted the trial court's findings.
Sagrera stated on proffer that no one had told him that the inspection and seizure had an effect on the Louisiana alligator industry. Plott stated no one had told him that the decline in the price of alligator products during 1991 and 1992 was the result of the inspection and seizure. This testimony does not interdict the trial court's finding that the actions by DWF caused Pelts' damages. Neither statement concerned the effects of DWF's actions on Pelts; they addressed issues concerning the alligator industry at large. Finding the error of excluding Sagrera's and Plott's testimony harmless, we will apply the clearly wrong-manifest error standard to our review of the trial court's finding of causation.

C. TAKEHARA'S DEPOSITION
DWF also asserts the trial court erred in failing to allow the deposition testimony of Mr. Takehara to impeach Ted Joanen. During Joanen's testimony, he testified Takehara, a buyer, had made certain statements to him. On cross, DWF attempted to offer Takehara's deposition testimony, taken in another related matter, which contradicted what Joanen testified that Takehara had said. The deposition was not allowed into evidence.
Deposition testimony is generally allowed when used to impeach a witness with a prior inconsistent statement. La.C.C.P. art. 1450 A(1); Citgo Petroleum Corp. v. Yeargin, Inc., 95-1574, p. 35 (La. App. 3 Cir. 2/19/97); 690 So.2d 154, 174, writs denied, 97-1223, 97-1245 (La.9/19/97); 701 So.2d 169, 170. However, it is to be offered at trial against the witness as the declarant of the deposition testimony to challenge his own alleged inconsistent statement made during a deposition. We find no authority for the use of the deposition testimony of one individual for impeachment of another witness, particularly when the deposition statement is from another proceeding and when the deponent is not present at the time the deposition is offered. We note, but find little direction from, the discussion in Saacks v. Saacks, 97-570, p. 13 (La.App. 5 Cir. 1/27/98); 708 So.2d 1077, 1083, writ denied, 98-0502 (La.4/3/98); 717 So.2d 232, wherein deposition testimony taken in an unrelated matter was not admitted. In *124 that case, Mrs. Saacks offered the deposition testimony of Jay Saacks, Mr. Saacks' brother, to show contradictions between Jay's statements in his deposition and Mr. Saack's testimony at trial. The deposition was offered to impeach Mr. Saack's credibility. The appellate court affirmed the failure to admit the deposition, reasoning the trial court had offered to hold the proceedings open for Mrs. Saack to depose Jay Saack, which she failed to do, and because the statements sought to be introduced were cumulative.
We find no error with the trial court's failure to admit Takehara's deposition to impeach Joanen. Takehara's deposition was not offered for the purpose of "contradicting or impeaching the testimony of [the] deponent as a witness". See La.C.C.P. art. 1450 A(1). Takehara was not a witness in the instant proceeding. Moreover, Takehara's deposition was taken in another proceeding and there is no indication Takehara knew or approved of its use in this proceeding. See La.C.C.P. arts. 1453, 1455, and 1456.

D. BANKRUPTCY TAPE
Lastly, DWF argues the trial court erred in failing to admit into evidence a complete tape recording of PAF's January 2, 1992 bankruptcy hearing. Excerpted portions of the hearing were heard and admitted without objection during plaintiff's case in chief. DWF had used the excerpts for impeachment, as evidence of prior inconsistent statements by Casey. At the close of the trial, DWF attempted to introduce that portion of the actual tape and a written transcript of that portion of the tape already heard by the trial court. The trial court did not allow the excerpts to be introduced, stating, "I don't think you can pick and choose through the tape and then bring forward the excerpts that you want." DWF then offered the entire tape and transcript of the hearing. The trial court again ruled against admission of the evidence, stating,
I will maintain the same ruling.... I let you use the tape for the purpose that I thought was a sound evidentiary basis and that was to question the man on cross-examination about a prior inconsistent statement or not [sic], but to just put the whole tape in and to impose on some subsequent reviewer the duty to sit down and listen to a whole tape, I think, is unduly burdensome and that is my reason....
Louisiana Code of Evidence article 607 D(2) allows extrinsic evidence to be admitted when offered solely to attack the credibility of a witness, unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. The trial court's ruling seems to be based on the "undue consumption of time" grounds; however, we find this reasoning faulty. The trial court has no discretion to refuse to admit evidence which may require time by the appellate court. Rather, the trial court's discretion of whether to admit evidence is, in this instance, to protect the trial court's time by preventing wasteful excursions that offer no help to the trier of fact.
However, we need not reach this issue. Assuming arguendo that the trial court erred in failing to admit the tape and transcript, we nevertheless find such error to be harmless. The evidence being offered was purported proof that Casey had made prior inconsistent statements. Those portions of the tape which DWF asserts were proof of Casey's inconsistent statements were heard by the trial court during cross-examination of Casey. The subsequent offer by DWF of the tape and transcript was cumulative.

II.
DWF also asserts the trial court erred in the award of damages to Pelts, arguing error in both the finding of causation and in the award of specific elements of damage.

*125 A. CAUSATION
The manifest error test requires the reviewing court to consider the record as a whole to ascertain whether the trier of fact's findings and conclusions constituted manifest error. Since the trier of fact's findings are accorded great weight on appeal under this standard of review, an appellate court may only reverse if it concludes from the record that a reasonable factual basis does not exist for the trier of fact's findings and the appellate court must further determine that the findings were clearly wrong based on the record. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. The trial court found that the actions of DWF were the cause of Pelts' damage. We find no manifest error in that conclusion.
DWF disputes the inspection and seizure by DWF agents caused Pelts' January 1992 bankruptcy. DWF argues that the September 24, 1991 actions by the Enforcement Agents, in inspecting and seizing skins from Pelts' warehouse, were not the proximate cause nor the cause-infact of Pelts' January 1992 bankruptcy. Pelts argues the bankruptcy negatively affected its reputation and resulted in lost profits. Pelts argued at trial and presented in brief that the inspection and seizure of skins from Pelts, along with the concurrent criminal charges, caused widespread anxiety within the international alligator industry, with devastating financial effects. Pelts asserted investors were unwilling to invest in the Louisiana industry, and specifically, Casey was unwilling to ask Pelts' investors to invest in his operations because of the pending criminal charges. Without these investments, Pelts could not make a scheduled payment due from PAF and Pelts, as a co-signer on the loan, on a note payable to Alerion Bank. PAF sought protection in bankruptcy and, because the note was cross-collateralized, Pelts was also forced to declare bankruptcy.
Casey testified that because of the seizure and criminal charges, he was unwilling and unable to solicit investments from his previous investors. In addition, one customer of Pelts testified the inspection and seizure changed the way it conducted business with Pelts, engaging in less business because of the risk. Casey stated that because of the resulting shortage of funds, PAF and ultimately Pelts were forced to declare bankruptcy, and Pelts' bankruptcy resulted in lost profits. In addition, Joanen, Pelts' expert in the alligator industry, testified the impact of the inspection and seizure on the industry as a whole was devastating. Joanen also stated the inspection and seizure created a financial hardship on Pelts.
Sagrera testified the industry as a whole suffered from low prices during 1991 because the Gulf War reduced demand for luxury items, the economic recession, and the over-production of alligator skins. He also stated that before the inspection and seizure, Pelts had a reputation in the industry as unreliable and delivering poor quality.
Considering all the evidence presented at trial, we find the trial court was not clearly wrong in concluding the plaintiff's damages were caused by the inspection and seizure of skins and the pending criminal charges.

B. DAMAGES

1. Lost profits
DWF also assigns as error the trial court's award of certain items of damage. The first element of damages DWF seeks to modify is the $3,961,416 amount awarded for "Lost Profits". DWF argues this amount was not lost profits, rather it was a calculation of "lost contribution margin". Dean Graves, a long-time employee of the Arthur Anderson accounting firm, testified for plaintiff. Graves stated the damages to Pelts totaled $3,961,416. When questioned by defendant during cross-examination, Graves stated his actual total damage amount was "lost contribution margin". He went on to define this as the "difference *126 between revenues and variable expenses." This calculation would then be continued by subtracting certain "fixed expenses" to determine gross profits. "Selling and general administrative expenses" would then be subtracted for net profit. Graves stated he projected these losses through 1996, based on Pelts' failure to obtain its projected market share from 1992 through 1996, the last year for which figures were available. He also testified that he assumed the Pelts organization that emerged from bankruptcy in August 1993, combining the farming activities of PAF and the exporting activities of Pelts, was the same entity as the preinspection Pelts. Graves stated they had always been a "single economic entity".
Loss of profits is a recoverable item of damage. See Louisiana Farms v. Louisiana Department of Wildlife and Fisheries, 95-845, p. 36-8 (La.App. 3 Cir. 10/9/96); 685 So.2d 1086, 1105-6, writs denied, 97-0486, 97-0507 (La.4/4/97); 692 So.2d 420, 422. While damages for loss of profits may not be based on speculation and conjecture, such damages need only be proven within a reasonable certainty. Landry v. Bourque, 460 So.2d 33, 34 (La. App. 1 Cir.1984), writ denied, 464 So.2d 1378 (1985). An appellate court will not disturb such damage awards in the absence of a manifest abuse of discretion. Louisiana Farms v. Louisiana Department of Wildlife and Fisheries, 95-845 at 36; 685 So.2d at 1106. Lost profits are generally calculated by deducting the expenses that would have been incurred from the gross revenues that could have been realized. Marcel v. Becnel, 96-1139, p. 9 (La.App. 1 Cir. 3/27/97); 691 So.2d 1344, 1349, writ denied, 97-1080 (La.6/13/97); 695 So.2d 984. The jurisprudence is clear that fixed costs are not to be deducted from gross revenues in determining an award for lost profits. Naquin v. Department of Transportation and Development, State of Louisiana, 604 So.2d 62, 68 (La. App. 1 Cir.), writ denied, 608 So.2d 169 (1992); Rosbottom v. Office Lounge, Inc., 94-894, p. 3 (La.App. 3 Cir. 4/5/95); 654 So.2d 377, 379; White v. Rimmer & Garrett, Inc., 360 So.2d 914, 918-19 (La.App. 3 Cir.1978). Fixed costs are defined as those "[c]osts that do not vary with changes in output," such as management expenses, taxes and depreciation expenses. Black's Law Dictionary 440 (Abridged 6th ed.1991); see also Rosbottom v. Office Lounge, Inc., 94-894 at 3; 654 So.2d at 379.
Therefore, we find no error with Pelts' formula for calculating lost profits. Our review of the record establishes when asked to "[g]ive us the total lost profit damages for Louisiana and non-Louisiana" Graves testified lost sales in Louisiana from 1991 through 1995 were $3,370,694 and non-Louisiana lost sales for this period were $590,722 for a total loss of $3,961,416, and this is the amount awarded by the trial court. Graves stated he adopted these figures after multiple calculations, choosing this as "probably the best data set to use...." These figures were derived by applying a "margin" factor or profit per skin sold, which was calculated for each year, to the "lost sales". Lost sales was the difference between actual sales, from figures supplied by DWF, and the forecast sales anticipated by Pelts. This calculation was made for each year, 1991 through 1995.
We find no manifest error in these calculations for years 1991, 1992 and 1993. However, we find no basis in the record for the inclusion of years 1994 and 1995. Graves stated he included these later years because, "[t]here will reach a point where Pelts should achieve 50 percent of the market in the farm and 40 percent of the market in the wild, and at that point and time the damages would cease." Presumably, because Pelts had not attained this market share as of tag year 1995, with no figures available at the time of trial for 1996, the damage was continuing. However, when questioned, although Casey stated that he felt Pelts was growing at a level such that it would have a 50 percent market *127 share, he emphatically credited the accountant from Arthur Anderson, the "damage expert", for the 50 percent projection.
A review of the market share data reveals Pelts grew from 23 percent in tag year 1988, to 27 percent in 1989, to 43 percent in 1990, to 47 percent in 1991. This growth slowed in 1992, following the inspection and seizure to 33 percent in 1992 and 28 percent in 1993. However, by tag year 1994, Pelts again had a 45 percent market share.
We find it was manifestly erroneous to find lost profits damage continuing after Pelts had reestablished itself in the alligator industry by controlling 45 percent of the market. While Pelts, or the accountants from Arthur Anderson, optimistically projected a 50 percent market share, a return to a 45 percent market share certainly establishes that Pelts' financial condition had recovered from the effects of DWF's actions. We utilize the same calculations and data employed by Graves; however, we award Pelts lost profits only through 1993. Accordingly, we amend Pelts' award for lost profits to $1,517,843.[4]

2. Lost skins
DWF also argues the trial court erred in its award for lost skins. The judgment awards Pelts $74,627 for 378 lost skins. DWF asserts in brief it was error to award damages for the skins seized on the day of the inspection, as they were determined by the Enforcement Agents to be in violation of the skinning and tagging regulations. However, this issue was conceded by DWF at trial when the following colloquy took place:
[Attorney for DWF]: [W]hat we stipulated to was that the department acted improperly in getting into this left hand, right hand business, and what was reserved specifically in the stipulation was the extent of damages, including discrete items of damage, for example, nobody contests that these people should be compensated for the hides that were seized.... That's not an issue.
We, therefore, affirm the $74,627 award for 378 seized skins.

3. Deteriorated skins
In addition, DWF asserts the trial court erred in the $21,986 award for 105 deteriorated skins. DWF maintains the skins that went unsold until April 1992 and suffered deterioration were not removed on direction of DWF. Casey testified at trial he removed skins from his inventory which he felt were "skins that were [a] flap issue."[5]
We agree with DWF. Any loss sustained by Pelts from Casey's decision to remove from commerce skins which had been inspected, but had not been seized, is not an element of damage for which DWF is liable. In addition, we note a glaring contradiction in the alleged proof of this loss by Pelts. Although Casey stated he held out 78 skins which were later sold for a loss, the accounting prepared by Arthur Anderson, which was utilized by the trial court as an attachment to the judgment, included an amount based on 105 deteriorated skins. We, therefore, reverse the award of $21,986 for 105 deteriorated skins.
4. Pelts' and PAF's bankruptcy expenses
In brief, DWF argues error in the trial court's award for Pelts' bankruptcy expenses. DWF also argues the trial *128 court erred in awarding Pelts bankruptcy expenses incurred by PAF. The trial court made an award for "Reorganization Expenses" in the amount of $383,079. Addressing first the bankruptcy expenses of PAF, we find the trial court erred in including reorganization expenses incurred by PAF. Even if PAF's bankruptcy was caused by the actions of DWF, which we specifically do not herein hold, PAF is not a party to this litigation and Pelts cannot be awarded damages which were suffered by another.
After our review, we find no manifest error in the trial court's finding that the acts by DWF during the inspection and seizure caused Pelts' bankruptcy. An award for the fees Pelts incurred during the bankruptcy is proper. However, we find manifest error in the trial court's blanket adoption of the amount to be awarded, as was submitted to the court and included in the attachment to the trial court's judgment.
Robert Maher, a CPA with the accounting firm of Deloitte & Touche, testified at trial. Maher stated Deloitte & Touche was involved in the preparation of information for Pelts for the bankruptcy court. He testified that he "believe[d] about $80,000.00 was attorney fees on Plaquemines Alligator Farms and about $200,000.00 was attorney fees on Pelts' books, of the '93.... '93 I don'tis the only one I have had a chance to sort of check." Casey also testified concerning this item of damage, stating the "[b]ankruptcy reorganization fees that we paid for the eighteen month period and slightly after the eighteen month period, the residual bills coming in, $383,000." In addition, admitted into evidence was the Deloitte & Touche "Independent Auditors' Report" for "Pelts & Skins Export, Ltd." dated April 27, 1995, which listed reorganization expenses. The report listed these expenses during 1993 as $303,829 and during 1994 as $79,250, for a total amount of $383,079. These items would necessarily include fees incurred by PAF, as it was merged with Pelts, effective July 15, 1993. Lastly, over DWF's objection, voluminous statements by numerous law firms were admitted into evidence, which Pelts identified as "Legal Bills". These bills do not contain a summarization, and a cursory review reveals they include such items as "PAF-Chapter 11", representation of Casey on tax issues and a letter concerning the appraisal of a home. In short, the evidence fails to support Pelts' $383,079 award for reorganization fees and is inconclusive as to what award should be made.
The plaintiff bears the burden of establishing each and every element of damage claimed. Miller v. Mahfouz, 563 So.2d 1223, 1226 (La.App. 1 Cir.), writ denied, 569 So.2d 967 (1990). Under the circumstances, we find that the plaintiff's evidence does not meet the standard required. The trial court was in error to award this element of damage. The portion of the judgment awarding $383,079 for reorganization expenses is reversed.

5. Criminal defense costs
DWF asserts in brief the trial court erred in awarding criminal defense costs to Pelts. DWF argues these costs were incurred in defense of a federal criminal prosecution and are not proper. However, at trial, during an exchange between counsel for DWF and the court, counsel for DWF stated, "Nobody seriously contests that these people should be compensated for any legal fees they incurred in defending the criminal prosecution." DWF has conceded this element of damage. We, therefore, affirm the $58,585 award for criminal defense costs.

6. Civil legal costs
Lastly, DWF argues the trial court erred in awarding $108,000 in civil legal costs identified on the signed attachment to the trial court's judgment as "Stop Illegal Actions". After our review of the record, we find no conclusive evidence in support of this element of damage. While *129 the before-mentioned legal bills may include documentation for these fees, we are unable to determine which fees were specifically for "Stop Illegal Actions" costs. Moreover, this award seems to be for reimbursement of legal fees expended by Casey in seeking and obtaining an injunction against DWF.
The supreme court in Rhodes v. Collier, 215 La. 754, 764, 41 So.2d 669, 673, (1949) held that attorney's fees are not recoverable in a civil action in the absence of a statute or contract. Plaintiff has not cited, nor do we find, any statutory authority for an award of attorney's fees for the issuance of an injunction. But see La.C.C.P. art. 3608 (for the authority for attorney's fees for the wrongful issuance of an injunction). We, therefore, reverse the award of $108,000 for civil legal costs.

CONCLUSION
For the foregoing reasons, we affirm in part, amend in part, and reverse in part and render. That portion of the judgment of the trial court awarding Pelts lost profits is amended to award $1,517,843. The awards of $74,627 for lost skins and $58,585 for criminal defense costs are affirmed. The awards of $21,986 for deteriorated skins, $383,079 for reorganizations expenses, and $108,000 for civil legal costs are reversed. Accordingly, judgment is rendered in favor of Pelts & Skins Exports, Ltd. in the sum of $1,651,055. Costs associated with this appeal are assessed in equal portions of $4,236.68 each to plaintiff and defendant, for a total amount of $8,473.36.
AFFIRMED IN PART; AMENDED IN PART; AND REVERSED IN PART AND RENDERED.

ON REHEARING
The rehearing application filed on behalf of Pelts & Skins Export, Ltd. is granted in part. Pelts' rehearing application is granted for the limited purpose of amending the decree of our original judgment to correct the amount awarded Pelts for lost profits. We amend our award for lost profits to $1,660,303. Our decree is amended to provide as follows:
Judgment is rendered in favor of Pelts & Skins Export, Ltd. in the sum of $1,793,515.
In all other respects, the application for rehearing is denied.
NOTES
[1] In August 1993, Pelts emerged from bankruptcy. The present Pelts organization has both farming and exporting operations, consolidating the activities of both the original Pelts and PAF.
[2] Throughout the trial, DWF argued its stipulation did not encompass all elements of damages asserted by Pelts. The stipulation provided, in part:

The State of Louisiana, through the Department of Wildlife and Fisheries, hereby STIPULATES ITS LIABILITY to Pelts and Skins Export, Ltd. under pertinent Louisiana tort law, for economic and business damages arising out of the facts presented in plaintiff's petition, as amended. However, the State of Louisiana ... shall be entitled to litigate and contest all issues of causation, including ... discrete items of plaintiff's claimed damages.
[3] While the trial court's written reasons found DWF caused Pelts' damage, there were no findings of facts as to the amount of specific items of damage. The amounts were contained in an attachment to the judgment.
[4] This amount is derived from Graves' "Tag Year Market Share and Units" chart which states total lost margins as follows:

Tag Year 1991 $437,941
Tag Year 1992 839,720
Tag Year 1993 240,182.

[5] The skinning regulations each season required hunters to leave a designated flap of skin on the alligator when skinning. This flap changed each season; sometimes the designated flap was the tail, during other years it was the back, or a foot, as was the case in 1991.